## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION
## CIVIL ACTION NO. 5:20-CV-00165-KDB-DCK

| | | |
|---|---|---|
| A. G., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| Michael Fattaleh; William Manners; The | ) | |
| City of Statesville; Colleen Guerin, | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

    **THIS MATTER** is before the Court on Colleen Guerin and William Manners' Motion for Summary Judgment (Doc. No. 66), Michael Fattaleh's Motion for Summary Judgment (Doc. No. 67) and the City of Statesville's Motion for Summary Judgment (Doc. No. 73). Plaintiff opposes all three motions. (Doc. Nos. 78, 79, 80). The Court has carefully reviewed the motions and considered the parties' briefs and exhibits. For the reasons discussed below, the Court will **DENY** Guerin and Manners' Motion. The Court will also **GRANT in part** and **DENY in part** Fattaleh's Motion and the City of Statesville's Motion.[1]

### I.      RELEVANT BACKGROUND

    This lawsuit arises out of an incident involving L.G., a seven-year-old child with disabilities, and a School Resource Officer, Michael Fattaleh ("Fattaleh") at the Pressly Alternative School ("Pressly") in Iredell County, North Carolina. At the time of the incident, L.G. was a student at Pressly. L.G.'s disabilities include autism, sensory processing disorders, mental

---

[1] The Court initially scheduled oral argument on the City's motion for summary judgment but has determined that the Parties' written arguments fully explain their respective positions and further argument will only unnecessarily delay resolution of these motions until much closer to trial.

Case 5:20-cv-00165-KDB-DCK   Document 88   Filed 07/14/22   Page 1 of 48

disabilities, learning disabilities, and behavioral disabilities, and he also has difficulty with self-regulation and transitions. Consistent with his disabilities, L.G. was enrolled in a day treatment program at Pressly which included behavioral and mental health components along with educational instruction, and he had an Individualized Education Program ("IEP"). Michael Fattaleh was a Statesville Police Department officer and city employee assigned to Pressly. Collen Guerin was L.G.'s special education teacher and William Manners was a teaching assistant at Pressly.

On the day of the incident, L.G. became overstimulated due to "a number of incidents in L.G.'s classroom involving other students, resulting in multiple transitions in and out of the classroom." L.G. was moved to the school's "quiet room," accompanied by Colleen Guerin and William Manners, to allow him to calm down. Bobbie Samuels, a behavioral specialist assisting Guerin's classroom, was also present in the quiet room.

After arriving at the quiet room, Guerin, Manners, and Samuels subdued L.G. by standing on either side of him and holding him down in a chair (what is known as a "two-man restraint"), which complied with the requirements of their Crisis Prevention Intervention ("CPI") training. Guerin and Manners both believed they had the situation under control and that L.G. would soon calm down. Neither feared for the safety of anyone present, and neither requested any assistance from school staff or anyone else. A few minutes later, Officer Elliot Turner – another school resource officer employed by the Statesville Police Department and assigned to Pressly – stopped by the room to check on everyone. Manners indicated that the school staff did not require Turner's assistance. Officer Turner therefore did not intervene and continued with his duties.

Shortly after Officer Turner checked in, Officer Fattaleh entered the room. Fattaleh asked who was being restrained but sought no other information about L.G. or the situation. Then

Fattaleh allegedly witnessed L.G. spit in the direction of one of the staff members. He immediately informed the staff that "he's mine now," took L.G. into "custody" and handcuffed him. Fattaleh alleges that Manners had previously told him that spitting was a serious offense that required his intervention, but Manners denied telling Fattaleh anything about spitting. At the time of the incident, Fattaleh's training included basic law enforcement training, use of force training, specific SRO training, and service training shadowing another SRO at Pressly. However, it is at best unclear if Fattaleh received training on the use of force with disabled students in a school setting.

The handcuffing of a student who was in a controlled restraint was not normal practice at Pressly. Colleen Guerin testified that she "had never been in a position where a resource officer took a child out of a safe, controlled restraint and placed them in handcuffs." After taking control of the situation, Fattaleh placed L.G. face down on the floor with a pillow on the ground to protect his face. Then, over the course of the next 38 minutes, Fattaleh placed his knee in L.G.'s back, twisted his arms behind him, caused him to call out in pain, and made statements such as: "Are you acquainted with the juvenile justice system?"; "Have you ever heard the term babysitter? I take that term literally, my friend."; and, when L.G. cried out that his knee hurt, Fattaleh responded "yeah, this sucks, doesn't it?" (Doc. No. 68-15, 16 at 3:00:50).

During L.G.'s detention, Guerin and Manners did not tell Fattaleh to stop or express any concern. They did not ask if it was necessary or ask Fattaleh to remove the handcuffs. Nor did they provide Fattaleh with more information about L.G. and whether he was acting consistent with his disabilities. Fattaleh testified that if anyone had told him that his conduct was hurting L.G. that he would have altered his behavior.

Following an investigation, the Statesville Police Department concluded that Fattaleh used excessive force. (*See* Doc. No. 82-2 "Use of Force Report"). The Statesville PD found that the

amount of force used by Officer Fattaleh on L.G. was unnecessary, unreasonable, and "determined to be excessive . . .." *Id*. at p. 2. A formal Internal Affairs Investigation also investigated Officer Fattaleh's conduct. (Doc. No. 82-3 ("IA Investigation Report")). Ultimately, the IA Investigation reached two conclusions: (1) that Fattaleh used excessive force; and (2) that he engaged in conduct unbecoming of an officer. *Id*. at p. 23.

L.G. attempted, unsuccessfully, to return to school the next day; and he has not returned to a school setting since. (Doc. No. 81-8, 94:18-94:21); (Doc. No. 81-3 p. 176:9-177:9). Plaintiff's expert, Dr. David Husted, has expressed his "opinion, with a reasonable degree of medical certainty, that [L.G.] was clearly traumatized" by this experience. (Doc. No. 82-4, p. 28). L.G. has been diagnosed with PTSD, has been hospitalized in a psychiatric ward twice, and his aggression and violence towards his mother and others increased substantially after the incident. (Doc. No. 81-8, 140:17-141:4, 156:8-156:18). In sum, Plaintiff alleges that L.G.'s prognosis and life trajectory have been forever altered, and "as a direct result of this trauma [L.G.] has experienced a dramatic deviation in his developmental trajectory with marked worsening of his emotional condition, decline in adaptive potential, and heightened medical needs." (Doc. No. 82-4, pp. 28-29).

In October 2020, Plaintiff filed an initial complaint asserting claims against the Iredell-Statesville Board of Education ("School Board"), the City of Statesville, and Michael Fattaleh. (Doc. No. 1). A.G. later filed her First Amended Complaint, which, among other things, added Guerin and Manners as named defendants. (Doc. No. 24). The School Board was dismissed from the case as a defendant in June 2021 (Doc. No. 50).

4

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)); *see United States, f/u/b Modern Mosaic, LTD v. Turner Construction Co., et al.*, 946 F.3d 201, 206 (4th Cir. 2019).

A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if it might affect the outcome of the suit under the governing law." *Vannoy v. Federal Reserve Bank of Richmond*, 827 F.3d 296, 300 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003)**.** "The burden on the moving party may be discharged by 'showing' ... an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial," *Id*. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id*. at 324.

In determining if summary judgment is appropriate, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weigh[ing] the evidence or mak[ing]

Case 5:20-cv-00165-KDB-DCK   Document 88   Filed 07/14/22   Page 5 of 48

credibility determinations." *Variety Stores*, 888 F.3d at 659 (internal quotation marks omitted) (quoting *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017)); *see Modern Mosaic* at *2. "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)).

However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Also, the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Id*. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id*. at 249-50.

In the end, the question posed by a summary judgment motion is whether the evidence as applied to the governing legal rules "is so one-sided that one party must prevail as a matter of law." *Id*. at 252.

## III.   DISCUSSION

### I.   Defendants Guerin and Manners' Motion for Summary Judgment (Doc. No 66)

Plaintiff asserts claims under North Carolina law against Guerin and Manners for negligence/gross negligence and negligent infliction of emotional distress. (*See* Doc. No. 24).

6

A. Negligence/Gross Negligence

Under North Carolina law, to prove negligence a plaintiff must show: (1) a legal duty; (2) breach of that duty; (3) actual and proximate causation; and (4) injury. *Estate of Long v. Fowler*, 270 N.C. App. 241, 251, 841 S.E.2d 290, 299 (2020). Gross negligence requires a plaintiff to prove each element of negligence and show "wanton conduct done with conscious or reckless disregard for the rights and safety of others." *Id.* at 253. An act is wanton when "it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." *Foster v. Hyman,* 197 N.C. 189, 191, 148 S.E. 36, 37–38 (1929), *quoted in Parish v. Hill,* 350 N.C. 231, 239, 513 S.E.2d 547, 551 (1999).

Guerin and Manners first argue that they had no legal duty to "control" Officer Fattaleh. Under North Carolina law, the general rule is that there is neither a duty to control the actions of a third party, nor to protect another from a third party. *Scadden v. Holt*, 222 N.C. App. 799, 802, 733 S.E.2d 90, 92 (2012). Yet, an exception to this general rule exists where "there is a special relationship between the defendant and the third person which imposes a duty upon the defendant to control the third person's conduct; or a special relationship between the defendant and the injured party which gives the injured party a right to protection." *Hedrick v. Rains*, 121 N.C. App. 466, 469, 466 S.E.2d 281, 283-84, aff'd per curiam, 344 N.C. 729, 477 S.E.2d 171 (1996). Some examples of such recognized special relationships include: (1) parent-child, (2) master-servant, (3) landowner-licensee, (4) custodian-prisoner, and (5) institution-involuntarily committed mental patient. *King v. Durham Cty. Mental Health Developmental Disabilities & Substance Abuse Auth.*, 113 N.C. App. 341, 345-346, 439 S.E.2d 771, 774-775 (1994). Here, no such "special" relationship exists between Guerin and Manners and Officer Fattaleh. However, the fact that Guerin and Manners had no duty to control Fattaleh does not doom Plaintiff's claim. Guerin's and Manners'

7

duty, which as described below was to act reasonably considering all the circumstances, might involve important actions short of "controlling" Officer Fattaleh.

Beyond their disagreement over the duty to "control" Officer Fattaleh, the parties appear to agree on the applicable standard of care for these negligence based claims, which is that "a teacher is held to the same standard of care which a person of ordinary prudence, charged with the teacher's duties, would exercise in the same circumstances.". *See Foster v. Nash-Rocky Mt. Cnty. Bd. of Educ.*, 665 S.E.2d 745, 748 (N.C. App. 2008) (quoting *Payne v. N.C. Dept. of Hum. Resources*, 382 S.E.2d 449, 451 (N.C. App. 1989))). However, they predictably dispute the scope of the duty and whether Guerin and Manners breached it by failing to intervene further during Fattaleh' s detention of L.G.

In Defendants' telling, they sought to deescalate the situation to the best of their ability.[2] Guerin testified that she sought to deescalate the situation by trying to get L.G. to calm down and telling him the officer would release him if he calmed down. (Doc. No. 66-2, Guerin Depo. pp. 117-18, 134, 142, 198-200). Manners informed the administrators at the school about the situation in the quiet room. (Doc. No. 66-4, Manners Depo. p. 122-23, 130). Guerin also contends she told Fattaleh about L.G.'s issues. (Doc. No. 66-2, Guerin Depo. p. 142).

Plaintiff's version of events is decidedly different. Plaintiff argues that the Defendants breached their duty when they became aware of the unreasonable nature of Fattaleh's post- arrest conduct but made no meaningful attempt to stop it. *See, e.g.*, Doc. No. 81-3, Guerin Tr. 171:23-

---

[2] Defendants also contend that if they interfered with Fattaleh they could have been prosecuted for a crime. *See* N. C. Gen. Stat. § 14-223 (1994). The Court addressed this argument at the Motion to Dismiss stage and found it meritless. Doc. No. 50, p. 9 ("simply criticizing Officer Fattaleh's conduct or communicating with him in more detail about L.G.'s disabilities and the effect of his actions or reporting Fattaleh's conduct to others would not have resulted in obstruction of justice charges against Defendants.").

172:6 ("Q. And did you believe that was appropriate conduct at that time? A. No."), 138:6-138:12 ('I was worried, you know, about the force that was being used."), 141:1-141:10 (not appropriate for seven-year-old to be handcuffed), 249:7-249:25 (the incident was "shocking"); Doc. No. 81-5, Manners Tr. 145:11-146:23 ("I do feel like it was wrong."). According to Plaintiff, the only information either Guerin or Manners provided to Fattaleh was Guerin's statement that L.G. was "seven years old, he's autistic, and he's overstimulated right now." *See* Doc. No. 66-3, Guerin Tr. 142:18-142:20. Specifically, Plaintiff maintains that there were several measures that a reasonable teacher would have taken to stop or prevent the injuries suffered by L.G. such as:

> telling Officer Fattaleh to stop, that handcuffing and pinning L.G. to the ground was unnecessary, that he was hurting L.G., that they had the situation under control, or that they are trained in specific restraints for children with special needs so as to not cause additional harm. Either could have requested that Officer Fattaleh remove the handcuffs, move his knee from L.G.'s back, or cease aggressively twisting L.G.'s arms behind his body. The teachers also could have contacted other law enforcement officials – such as Officer Fattaleh's supervisor – or requested the assistance of a mobile crisis or other mental healthcare professional. Had they taken any of these steps, L.G. may have spent only a minute or two handcuffed on the floor, instead of staying there for 38 minutes and repeatedly enduring Officer Fattaleh's violent treatment.

*See* Doc. No. 83. Yet, the Defendants did none of these things.

These competing versions of events are plainly in conflict. Therefore, the Court finds that it is for a jury to determine – based on the witness testimony and the other evidence presented– whether Guerin and Manners breached their duty to L.G. This conclusion is reinforced by the fact a jury customarily gets the opportunity to apply the "reasonable person" standard in a negligence case. *See Jenkins v. Batts*, 248 N.C. App. 202, 211, 788 S.E.2d 628, 634 (2016) ("[s]ummary judgment is a drastic measure, and it should be used with caution, especially in a negligence case in which a jury ordinarily applies the reasonable person standard to the facts of each case.").

9

Accordingly, the Court finds that Defendants have not shown an entitlement to summary disposition of Plaintiff's claims and the Court will deny the motion for summary judgment.[3]

B. Negligent Infliction of Emotional Distress

To state a claim for negligent infliction of emotional distress a plaintiff must demonstrate that (1) the defendant negligently engaged in conduct; (2) it was reasonably foreseeable that such conduct would cause the plaintiff to suffer severe emotional distress; and (3) the conduct did, in fact, cause the plaintiff to suffer severe emotional distress. *Johnson v. Ruark Obstetrics & Gynecology Assoc., P.A.*, 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990).

The first element of an NIED claim requires that the "defendant failed to exercise due care in the performance of some legal duty owed to [the] plaintiff under the circumstances[.]" *Guthrie v. Conroy*, 152 N.C. App. 15, 25, 567 S.E.2d 403, 410-11 (2002). As discussed above, whether Guerin and Manners failed in their duty to L.G. must be decided by a jury. As for the second element, under North Carolina law the question of reasonable foreseeability "must be determined under all the facts presented and should be resolved on a case-by-case basis by the trial court and, where appropriate, by a jury." *Sorrells v. M.Y.B. Hosp. Ventures of Asheville*, 334 N.C. 669, 673, 435 S.E.2d 320, 322 (1993). While its full bounds are perhaps uncertain, North Carolina courts clearly limit the scope of "reasonable foreseeability" in the context of NIED claims to truly egregious circumstances. *See e.g.*, *Gardner v. Gardner*, 334 N.C. 662, 435 S.E.2d 324 (1993)

---

[3] The facts presented for the negligence and gross negligence claims are identical and therefore the Court will allow both claims to proceed to trial. However, based on the record presented, the Court is skeptical that Plaintiff will be able to present sufficient evidence to allow her claim for gross negligence against Guerin and Manners to be submitted to the jury. While a jury might conclude that the teachers did not do "enough," the record reflects their efforts to deescalate the situation and inform school administrators of what was going on. Therefore, it appears that it will be difficult for Plaintiff to establish that Guerin and Manners acted with a "wicked purpose" or manifested "a reckless indifference to the rights of others."

10

("While anyone should foresee that virtually any parent will suffer *some* emotional distress—'temporary disappointment ... or regret'—in the [death of a child], to establish a claim for NIED the law requires reasonable foresight of an emotional or mental disorder or other severe and disabling emotional or mental condition." (emphasis in original)).

However, many of the cases that turned on lack of foreseeability are distinguishable because the defendants did not know the existance of the person whose "severe emotional distress" they allegedly caused. *See e.g., Sorrells v. M.Y.B. Hosp. Ventures,* 334 N.C. 669, 674, 435 S.E.2d 320, 323 (1993) (reversing the North Carolina Court of Appeals on the issue of foreseeability because, among other things, "it does not appear that the defendant had any actual knowledge that the plaintiffs existed."); *Andersen v. Baccus*, 335 N.C. 526, 532-33, 439 S.E.2d 136, 140 (1994) ( noting that defendant "could not reasonably have foreseen that her negligent act, if any, would cause plaintiff to suffer severe emotional distress," in part because  "nothing suggests that [the defendant] knew of plaintiff's existence."). Here, there can be no such argument. Guerin and Manners were in the room with L.G. when their alleged negligence occurred. They knew L.G. had disabilities that might make him more likely to suffer extreme emotional distress. This heighted vulnerability is precisely why he attended Pressly. Consequently, Plaintiff has forecasted sufficient evidence to survive a motion for summary judgment on foreseeability.

And, finally, it is  credibly disputed that L.G. suffered severe emotional distress. (*See* Doc. No. 82-4, pp. 28-29) ("as a direct result of this trauma [L.G.] has experienced a dramatic deviation in his developmental trajectory with marked worsening of his emotional condition, decline in adaptive potential, and heightened medical needs."). Therefore, the Court will deny Guerin's and Manners' motion as to both of the Plaintiff's claims of negligence/gross negligence and negligent infliction of emotional distress.

**II.    Officer Fattaleh's Motion for Summary Judgment (Doc. No. 67)**

Plaintiff asserts claims against Michael Fattaleh for: (1) excessive use of force under 42 U.S.C. § 1983; (2) Negligence and Gross Negligence; (3) Intentional/Reckless Infliction of Emotional Distress; (4) Negligent Infliction of Emotional Distress; (5) Assault and Battery; (6) Punitive Damages; and (7) False Imprisonment. (Doc. No. 24). For the reasons discussed below, the Court finds that Fattaleh is not entitled to summary judgment on any claim except false imprisonment.

A.    Excessive Force Claim under 42 U.S.C. § 1983

While not a source of substantive rights, 42 U.S.C. § 1983 provides a vehicle to vindicate violations of rights, privileges, or immunities secured by the Constitution and laws of the United States. *Albright v. Oliver*, 510 U.S. 266, 271, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994). Section 1983 "imposes liability on any person who, under the color of state law, deprives another person 'of any rights, privileges, or immunities secured by the Constitution and laws.'" *Doe v. Kidd*, 501 F.3d 348, 355 (4th Cir. 2007) (citing 42 U.S.C. § 1983).

The Fourth Amendment prohibition on unreasonable seizures "bars police officers from using excessive force to seize a free citizen." *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003) (citing *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). The Fourth Circuit analyzes whether an officer has used excessive force under an objective reasonableness standard. *See Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). Determining the reasonableness of an officer's actions "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865). The officer's actions are examined "in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or

12

motivation." *Graham*, 490 U.S. at 397, 109 S.Ct. 1865; *accord Pegg v. Herrnberger*, 845 F.3d 112, 120 (4th Cir. 2017) ("Subjective factors involving the officer's motives, intent, or propensities are not relevant." (quoting *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994)).

*Graham* advances three non-exclusive factors for the Court to consider: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396, 109 S.Ct. 1865. The Court may identify other "objective circumstances potentially relevant to a determination of excessive force." *Kingsley v. Hendrickson*, —— U.S. ——, 135 S.Ct. 2466, 2473, 192 L.Ed.2d 416 (2015).

Fattaleh argues that no reasonable jury could find he used excessive force on L.G. Absurd. Indeed, the Statesville Police Department itself determined that Fattaleh used excessive force. (Doc. No. 82-2 Use of Force Report); (Doc. No. 81-10 Transcript of 30(b)(6) Deposition of The City of Statesville by David Onley ("30(b)(6) Onley Tr."), 9:7-10:11)). Also, , Captain Thomas Souther testified: "[Fattaleh] was putting force on a seven-year-old child. That's the big part there, he's seven years old. [. . . .] [A] grown man on a seven-year-old child. If I look at it, or *if the jury looks at it . . . I believe a reasonable person would have thought that was unreasonable*." (Doc. No. 81-13, 30(b)(6) Souther Tr., 37:19-38:11) (emphasis added). While not dispositive on the ultimate merits, this evidence strongly counsels against granting Fattaleh's summary judgment motion.

Now turning to the *Graham* factors, the first consideration is the "severity of the crime." Fattaleh notes that assault, in this case spitting, may be considered a serious offense. The Fourth Circuit has recognized that assault weighs against a student-plaintiff "because assault is an offense that can be considered violent if committed by any person, even a child." *E.W. by & through T.W.*

*v. Dolgos*, 884 F.3d 172, 180 (4th Cir. 2018). However, an assault is "tempered" where, as here, "the offense [was] a misdemeanor." *Id*. Further, the testimony of the other staff present appears to contradict Fattaleh's assertion that this was a serious assault. Guerin testified that spitting is a part of the job when helping special needs children. (Doc. No. 81-3, Guerin Tr. 117:4-117:5; 128:23-129:1; 144:25-145:10) ("But I've been spit on many times in my ten years of teaching because I always work with the specialized population. So, it's not enjoyable, but it happens. Q. Have you ever contacted law enforcement to press charges against a student for spitting? A. No."). Officer Turner stated that "it was common for students in the Day Treatment facility to swing, kick, or spit," Doc. No. 82-5 p. 3, but that he had never arrested or handcuffed a student at Pressly for spitting alone. (Doc. No. 81-6, 30:5-30:7, 32:12-32:15). Manners considered spitting not as serious as other behaviors encountered by Pressly staff. (Doc. No. 81-5 100:21-102:7 ("[I]t's not like kicking, hitting.")). *See Webster v. Chesterfield Cnty. Sch. Bd.*, No. 21-1545, 2022 WL 2311791, at *1 (4th Cir. June 28, 2022) (finding for the school in an employment dispute alleging a hostile work environment because a student's "groping, grabbing, and touching of [a teacher's] private areas" was "common for a child his age with his disabilities")

The second *Graham* factor is whether the student poses an immediate threat to the safety of the officers or others. When "assessing the threat an individual poses, it is often useful to consider the suspect's conduct at the time of the arrest and 'the size and stature of the parties involved.'" *E.W*., 884 F.3d at 180-81. If a child "had no weapons and made no threats," and was "quite small relative to . . . the arresting officer," that officer "could not have reasonably believed that [the student] presented any immediate risk of harm to anyone." *Id.* Fattaleh argues that L.G. continued to kick, scratch, and spit at him after he was detained. According to Fattaleh, this, along with L.G.'s personal history of violent behavior, supports the reasonableness of Fattaleh's use of

14

handcuffs and overall conduct. Fattaleh also contends that he reasonably believed there was a risk to L.G. if he was not secured and that he needed to handcuff L.G. to show the staff that he was in control of the situation "to protect [L.G.]". (Doc. No. 68-3, Fattaleh Dep., p. 264-69).

However, no one else present feared for their safety or expressed a concern for anyone else's safety. (*See* Doc. No. 81-3, Guerin Tr. 128:10-128:19, 134:2-134:12; Doc. No. 81-5, Manners Tr. 144:13-144:22; Doc. No. 81-9, Samuels Tr. 79:17-80:10). In fact, Fattaleh testified that he handcuffed L.G., not because of a safety threat, but because he allegedly had been told that Manners would not tolerate spitting. *See* Doc. No. 81-4, Fattaleh Tr. 246:17-247:19 ("So the student committed an assault by spitting. I exercised my discretion and decided to effect an arrest for assault."). Moreover, L.G. was in the quiet room with other school staff present. These staff members were trained in CPI techniques and were safely restraining L.G. at the time of Fattaleh's intervention. Consequently, whether an unarmed seven-year-old child with disabilities posed an "immediate" safety threat to four adult staff members is, at a minimum, for a jury to decide.

The third and final *Graham* factor is whether the individual is actively resisting arrest or seeking to evade arrest by flight. Fattaleh first argues that L.G. had a history of attempting to flee school settings.[4] Fattaleh maintains L.G. was "very agitated," "fighting," "very [,] very tense," and was "trying to get up, trying to harm himself, beat his head against the floor." Thus, Fattaleh argues he reasonably considered L.G. a flight risk. *See, e.g.*, (Fattaleh Dep., 284-85). ("[W]hat happened if I did get away and he gets up and runs headfirst into a wall?").

Plaintiff retorts that L.G. posed no serious resistance and was not a flight risk. First, Plaintiff argues that Fattaleh exaggerates L.G.'s "violent" resistance to being handcuffed. In fact,

---

[4] Plaintiff also maintains that Officer Fattaleh cannot rely on L.G.'s behavioral history as justification because he knew nothing of that history when he arrested L.G. *See* Doc. No. 81-4, Fattaleh Tr. 232:6:232:19; 370:14-370:18, 374:3-374:11.

15

L.G. never even tried to get up off the floor, much less flee the scene. Moreover, Fattaleh significantly outweighed L.G., which would tend to make any resistance futile. Plaintiff notes that Manners testified "let's just say, I mean, it's kind of hard to resist a police officer, right? I mean - - Q. Especially when you're seven, right? A. Okay. Fair enough." (Doc. No. 81-5 136:21-137:1). Further, Captain Souther concluded in the face of any resistance Fattaleh could have simply backed away and created distance, rather than use force. *See* Doc. No. 82-2, p.5.

In sum, viewing the evidence in the light most favorable to the Plaintiff, the Court finds that a reasonable jury could find that Fattaleh used excessive force against L.G. Accordingly, Fattaleh is not entitled to summary judgment on this claim.

B. Qualified Immunity

Qualified immunity protects officials "who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). The doctrine balances two important values— "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). The Fourth Circuit has stated:

> The basic rules of § 1983 [qualified] immunity are well known. Underlying the doctrine is a desire to avoid overdeterrence of energetic law enforcement by subjecting governmental actors to a high risk of liability. The concerns behind the immunity defense are especially salient in the context of street-level police work, which frequently requires quick and decisive action in the face of volatile and changing circumstances. The law thus shields police officers from civil liability unless the officer reasonably should have known that his actions violated clearly established constitutional rights.

*Rowland v. Perry*, 41 F.3d 167, 172 (4th Cir. 1994) (citations omitted) (emphasis added); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Put simply, qualified immunity protects 'all but

the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quotation omitted).

In carrying out the qualified immunity analysis, a court's "first task is to identify the specific right that the plaintiff asserts was infringed by the challenged conduct." *Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997) (en banc). The court then engages in a two-step inquiry, asking "whether a constitutional violation occurred" and "whether the right violated was clearly established" at the time of the official's conduct. *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010). Courts have discretion to take these steps in either order. *Pearson*, 555 U.S. at 236.

The inquiry into whether a right is clearly established must "be undertaken in light of the specific context of the case" and "not as a broad general proposition." *Saucier*, 533 U.S. at 195. As the Fourth Circuit has explained:

> It is not required, however, that a court previously found the specific conduct at issue to have violated an individual's rights. The unlawfulness of the officer's conduct need only be manifestly apparent from broader applications of the constitutional premise in question. Put differently, a right may be clearly established if a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct in question.

*E.W.*, 884 F.3d at 185.

Officer Fattaleh argues that even if Plaintiff can prove that L.G.'s constitutional rights were violated those rights were not clearly established, and he is therefore entitled to qualified immunity. Plaintiff relies on *E.W. v. Dolgos*, 884 F.3d 172 (4th Cir. 2018) as clearly establishing L.G.'s right to be free from excessive force in a school-setting.

In *E.W.*, a ten-year-old child on a school bus assaulted another student. The assault began after an altercation where the other student "stomped" E.W.'s shoe. E.W. responded by kicking and punching the other student in retaliation. Three days later, a deputy sheriff and school resource

officer removed E.W. from class after reviewing the surveillance video and talking to the other student. After E.W. appeared to brush off the incident and didn't "seem to care," the school resource officer placed E.W. in handcuffs from behind and reseated her. The school resource officer stated that she was concerned about the physical safety of herself and the school administrators because of both the incident and E.W.'s apathy. Just after being handcuffed, E.W. began to cry. She explained that she did not want to go to jail and that she would not hit the other student again. The school resource officer kept her handcuffed for about two minutes as she cried and apologized. The school contacted E.W.'s mother and informed her that the school resource officer would refer the matter to the Wicomico County Department of Juvenile Services. Eventually, the mother retrieved E.W. from the school. *See E.W.* 884 F.3d at 179-85.

After applying the *Graham* factors, the Fourth Circuit held that E.W. had shown a violation of her constitutional rights under the Fourth Amendment. The court reasoned: (1) while serious, the severity of the offense was tempered by the fact it was a misdemeanor; (2) the school resource officer could not have reasonably believed that E.W. presented any immediate risk of harm to anyone because she was calm and compliant and had no weapons and made no threats; (3) E.W. did not attempt to resist or flee at any point; (4) E.W.'s youth supported her claim because age is an important consideration when deciding whether to use handcuffs; and (5) the location weighed in in E.W.'s favor because all relevant activity took place in the school context.

However, the Fourth Circuit also found that the school resource officer was entitled to qualified immunity. The Court concluded that E.W.'s right not to be handcuffed under the circumstances of this case was not clearly established at the time of her seizure. Importantly, the court emphasized "that our excessive force holding is clearly established for any future qualified immunity cases involving similar circumstances." *Id.* at 187.

18

Fattaleh contends that the *E.W.* decision stands only for the narrow proposition that the handcuffing of a calm, compliant elementary school student in a school setting when no arrestable offense occurred in the school resource officer's presence is unreasonable and clearly established for future cases. However, this misreads *E.W.'s* holding. The Fourth Circuit explicitly held that "officers should not handcuff young students who may have committed minor offenses but do not pose an immediate threat to safety and will not evade arrest." *Id.* at 188. In this case a seven-year-old child with disabilities allegedly spit in the direction of school staff. He was at a school specifically designed to handle students with disabilities. He was in a secured quiet room surrounded by four adults, all who significantly outweighed him and were trained to handle such situations. Further, L.G. made no threats and had no weapons. Despite these facts, Fattaleh handcuffed and physically restrained L.G. (in part with "pain compliance techniques") for 38 minutes, much longer than the two minutes E.W. was handcuffed.

While *E.W.* is not perfectly analogous to this case, perfection is not the standard. Simply put, *E.W.* placed Fattaleh, and all school resource officers on notice that young children who commit minor offenses should not be handcuffed if they pose no safety threat or flight risk. And that is what happened here. Fattaleh is therefore not entitled to qualified immunity.

C. State Law Claims

*1. Public Official Immunity*

Officer Fattaleh argues that all of Plaintiffs' negligence-based claims fail because he is entitled to public official immunity. Under North Carolina law, "a public official, engaged in the performance of governmental duties involving the exercise of judgment and discretion, may not be held personally liable for mere negligence in respect thereto." *Smith v. State*, 289 N.C. 303, 331, 222 S.E.2d 412 (1976) (quoting *Smith v. Hefner*, 235 N.C. 1, 7, 68 S.E.2d 783 (1952)). This

immunity has been recognized at common law for over a century. *See Epps*, 122 N.C. App. at 202. North Carolina courts have deemed police officers engaged in performance of their duties as public officials for the purposes of public official immunity. *Campbell v. Anderson*, 156 N.C. App. 371, 376, 576 S.E.2d 726 (2003).

However, public official immunity is not absolute. Public officials' actions are not shielded if their actions were "(1) outside the scope of official authority, (2) done with malice, or (3) corrupt." *Wilcox*, 222 N.C. App. at 288. An individual acts with malice when he "wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *Evans v. Croft*, 265 N.C. App. 601, 827 S.E.2d 342 (2019). Therefore, whether Fattaleh is entitled to public official immunity turns on whether he acted with malice.

Fattaleh offers his own deposition testimony to show he did not act with the required malice. Fattaleh testified that he did not want to hurt L.G., and that he cared deeply about his job and the students at Pressly. (*See* Doc. No. 81-4, Fattaleh Dep., 293-94 ("I mean, if what I'm doing is causing harm, then I'm going to move to correct what I'm doing. That's just – to me, that's just common human compassion. Like there's – look, legal stuff aside, I didn't want to hurt that kid. All right? And I – and if there was any way that could have improved his situation, even in a minor way, I tried.")); (*id.* at 295 ("I cared about him a lot because of what I did [for a living], why he was there, a whole host of reasons. That was my life. That's what I did. That's what I decided to do every day.")).

However, these self-interested statements are insufficient. *See Showalter v. N.C. Dep't of Crime Control & Pub. Safety*, 183 N.C. App. 132, 136, 643 S.E.2d 649, 652 (2007). Fattaleh used pain compliance techniques, appeared agitated with L.G., and engaged in a contentious back and

20

forth with L.G. *See, e.g.*, IA Investigation Report, p. 22 (Officer Fattaleh "seemed to get more agitated than was necessary when the child became aggressive or offensive towards him."); Bodycam at 3:00:50 (L.G.: "Ow! My knee! My knee! It really hurts!" Officer Fattaleh: "Yeah, it sucks, doesn't it?"). Whether this conduct shows the required malice to breach the shield of public official immunity is for a jury to decide. There is much more than sufficient evidence for a jury to find that Fattaleh acted with malice. Hence, Fattaleh is not entitled to public official immunity at this stage of the action.

### 2. *Merits of State Law Claims*

#### a. False Imprisonment

False imprisonment is the illegal restraint of the person of anyone against his will. *State v. Lunsford*, 81 N.C. 528, 530 (1879). Thus, illegality is an essential element. *See Pearson v. Newcomb*, 60 F.3d 824 (4th Cir. 1995). Under North Carolina law the use of excessive force after a lawful arrest does not render the initial arrest illegal. *See State v. Anderson*, 40 N.C. App. 318, 322, 253 S.E.2d 48, 51 (1979).

There is no real dispute that L.G. was spitting at school staff. *See* (Doc. No. 68-3, Fattaleh Dep., 247:9-12); (Doc. No. 68-9, Manners Dep., 119); (Doc. No. 68-5, Guerin Dep., 117). In North Carolina spitting on another person is a misdemeanor assault. *See* N.C. Gen. Stat. § 14-33; *see also* N.C. Gen. Stat. § 14-33(c)(6) (assault on a school employee); *see also* Doc. No. 68-13, City 30(b)(6) Dep. (Onley), 46-47. While it can be argued that Fattaleh should have used his discretion and not arrested L.G. for a minor offense, he still technically witnessed a crime. Therefore, the essential element of illegality is not met, and the false imprisonment count will be dismissed.

#### b. Other State Law Claims

As noted above, Plaintiff asserts claims under North Carolina law for: Negligence and Gross Negligence; Intentional/Reckless Infliction of Emotional Distress; Negligent Infliction of Emotional Distress; Assault and Battery; and Punitive Damages. Fattaleh contends that all these state law claims fail for substantially the same reasons already discussed. That is, the arrest of L.G. was lawful, the force used was reasonable under the circumstance, and his conduct was not "extreme or outrageous." The Court need not repeat its above analysis. *See Supra* Section A. 42 U.S.C. § 1983. It is enough to note that there are disputed facts sufficient for a jury to find for Plaintiff on any of these other state law claims.

### 3. City of Statesville's Motion for Summary Judgment (Doc. No. 73)

The City of Statesville seeks summary judgement on all of Plaintiff's multiple claims against the City. While those claims directly or indirectly involve many of the same facts and legal principles discussed above with respect to Plaintiff's claims against the other Defendants, the City is entitled to the Court's careful and separate consideration of each claim against each Defendant. Accordingly, all of Plaintiff's claims against the City are discussed below. In sum, the Court will deny the City's motion as to all of Plaintiff's claims with the exception of her state law claims for false imprisonment, punitive damages, and negligent hiring, supervision, and retention.

A. Claims under 42 U.S.C. §1983

Claims against municipalities for violation of 42 U.S.C. §1983 primarily based on a "failure to train" a municipal employee charged with serious wrongful conduct against one of the city's residents often present difficult choices for the Court, which must balance the citizen's and the city's rights. This close case fits that common mold. For the reasons discussed below, the Court will, only for the purposes of the City's summary judgment motion, allow Plaintiff's Section 1983 claim to proceed to trial.

In her claim against the City under 42 U.S.C. § 1983, Plaintiff asserts what is commonly referred to as a *Monell* claim for the city's alleged inadequate training and supervision of Officer Fattaleh. Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983; *Hart for J.G. v. Union Cnty.*, No. 319CV00159KDBDCK, 2020 WL 710802, at *3–4 (W.D.N.C. Feb. 12, 2020). The "under color of state law" element imposes upon Plaintiff the burden of showing that an official policy or custom of the City caused the constitutional deprivation. *Mentavlos v. Anderson,* 249 F.3d 301, 310 (4th Cir. 2001). This requirement exists because a municipality cannot be held liable under § 1983 based on the doctrine of *respondeat superior. See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978) ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy or some nature caused a constitutional tort."). Rather, Plaintiff must show that the City itself caused the constitutional violation. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

Under *Monell*, there are four theories that can be potentially pursued under Section 1983 to show an unlawful custom, policy, or practice: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train [employees], that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law." *See Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)).

Plaintiff claims the City violated L.G.'s constitutional rights under the third theory; that is, because of its "failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens.'"[5]

Beyond identifying one of the four *Monell* theories, the plaintiff must also demonstrate that, through its deliberate conduct, it was the "moving force" behind the injury alleged. *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,* 520 U.S. 397, 404 (1997). In other words, a plaintiff must show that the action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the action and the deprivation of federal rights. *Id.*

Plaintiff alleges that the City was "deliberately indifferent" to the fact its training and supervision policies were inadequate to protect L.G. from violation of his constitutional rights. Plaintiff alleges that a specific training deficiency – the failure to instruct Officer Fattaleh on if and how to intervene and use force when special needs schoolchildren "act out" – made the constitutional violations a "reasonable probability rather than a mere possibility." *See Spell v McDaniel*, 824 F. 2d 1380, 1390 (4th Cir. 1987); *Semple v City of Moundsville*, 95 F. 2d 708, 713 (4th Cir. 1999).

Any failure to adequately train must be "so egregious as to warrant a finding that it amounts to a policy or custom for which the municipality should be held responsible." *Hall v. Burney*, 454 Fed. App'x 149, 151 (4th Cir. 2011). However, in *City of Canton*, the Supreme Court indicated "that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations." *Bd. of the Cnty. Comm'rs v. Brown, 520 U.S. 397, 409* (1997). Thus:

---

[5] Plaintiff does not allege an express policy, a decision of a person with final policymaking authority, or a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

> [A] violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice-namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also support an inference of causation--that the municipality's indifference led directly to the very consequence that was so predictable.

*Id.* at 409-410.  The Supreme Court gave an example in *City of Canton*: the certainty that police officers will be required to arrest fleeing felons, and that because officers have been provided firearms to accomplish that task, "the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized  as 'deliberate indifference' to constitutional rights." *Id*., 489 U.S. at 390, n. 10 (internal citation omitted).

Still, in *City of Canton*, the Court required that "only where a failure to train reflects a deliberate or conscious choice by a municipality . . . can a city be liable for such a failure under § 1983." *Id*. at 390. The Court reasoned that "the focus must be on adequacy of the training program in relation to the tasks that the particular officers must perform." *Id.* The Court stated, "that a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Id.* at 390-91. The Court continued:

> Neither will it suffice to prove that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.  Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual recurring situations with which they must deal.  And, plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

25

Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury. Thus, in the case at hand, respondent must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs.

*Id.* at 391.

The City contends that it cannot be found to have acted with deliberate indifference to Officer Fattaleh's training because the record reflects that Officer Fattaleh had, at a minimum, basic law enforcement training; use of force training; specific SRO training and in service training shadowing another SRO specifically in his assigned post at Pressly, the school serving special needs students where he worked. Additionally, the Statesville Police Department had standard operating procedures in place that governed proper use and application of force. The City argues that Officer Fattaleh understood as an SRO his role was not to intervene in every disciplinary situation but rather if he witnessed a crime, as he contends he did with respect to L.G., to exercise his discretion as an officer and make an arrest. *See* Doc. No. 73-4 at 347-348.

The City repeatedly argues and emphasizes that the Court should analyze L.G.'s conduct as "criminal" behavior, affording Officer Fattaleh broad discretion to effect an arrest. But, the City's characterization of the conduct as "criminal" and the fact of the "arrest" misunderstands (or seeks to avoid) the real question, which is the constitutional limits of how a SRO may react to the disruptive behavior of a seven-year-old disabled student, including *after* an arrest is made. Every push and scuffle among students is technically an "assault" and every time a student takes another student's backpack to gain their attention there has been a "theft," so labeling a student's behavior as a potential "crime" doesn't answer the question before the Court. Indeed, very recently the Fourth Circuit has made clear that "assaults" in a special education classroom must be viewed in the specific context of that setting, where such behavior is expected and must be considered as part of the "difficult balance that schools must find between ensuring that *all* students have access to a

public-school education while simultaneously maintaining a nonhostile work environment for all employees." *Webster*, No. 21-1545, 2022 WL 2311791, at *1(emphasis in original) (holding that a student's frequent and aggressive "groping, grabbing, and touching of [a teacher's] private areas" did not create a hostile work environment where that "behavior was common for a child his age with his disabilities"). If, as a matter of law, the far more serious misconduct in *Webster* does not create a "hostile" environment, then it would be inconsistent to give preclusive effect to the City's effort to criminalize L.G.'s "spitting" as a matter of law or, even accepting the lawfulness of the arrest, fail to consider the consequences of the City's failure to train its officers on whether and how to use force to handle a disabled student following an arrest.

The City also contends that Plaintiffs fail to forecast any evidence to show any deficiency in training or policy actually caused the incident. Again, in the City's telling, Officer Fattaleh observed a criminal act committed in his presence and reacted within his discretion effectuating an arrest initially in compliance with standard operating procedures. That another SRO encountering the same situation may have reacted differently, or exercised his/her discretion differently, is not indicative of any inadequacy in training or policy. Thus, the City asks the Court to reject any argument that the City "could have done" something more to prevent the incident. "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *City of Canton* at 392, 109 S. Ct. at 1206. A failure to train must reflect a deliberate indifference, noting a lesser standard "would result in de facto *respondeat superior* liability on municipalities" – a result the Court rejected in its holding in Monell." *Id*.

27

Moreover, the City argues that under *Monell* a single incident is almost never enough to warrant municipal liability. "Proof of a single incident of the unconstitutional activity charged is not sufficient to prove the existence of a municipal custom." *Semple v. City of Moundsville*, 195 F. 3d 708, 713-14 (4th Cir. 1999). "At its core, the strict *Monell* test asks for some level of notice." *Estate of Jones v. City of Martinsburg*, 961 F. 3d 661, 672 (4th Cir. 2020). "A pervasive risk of harm may not ordinarily be shown by pointing to a single incident or isolated incidents'…'nor is a showing that individual officers violated a person's constitutional rights on an isolated occasion…sufficient to raise an issue of fact whether adequate training and procedures were provided." *Orpiano v. Johnson*, 632 F. 2d 1096, 1101 (4th Cir. 1980); citing *Withers v. Levine*, 615 F. 2d 158, 161 (4th Cir. 1980), and *McClelland v. Facteau*, 610 F. 2d. 693, 697 (11th Cir. 1979).

According to the City, Plaintiff forecasts no evidence of repeated similar incidents of excessive force occurring between students and SROs nor evidence of prior behavior or conduct by Officer Fattaleh, or any other SRO, providing notice to superiors of any inadequacy or need for additional training. The City argues that the need for additional training or policies cannot be said to be obvious in light of a lack of evidence showing prior instances of excessive force similar to the incident at issue in Plaintiff's claim, or evidence it was likely to occur. Therefore, the City asks that this Court find that its conduct does not rise to the level of "deliberate indifference," so Plaintiff's forecast of evidence fails to establish the necessary elements to extend liability to the City under 42 U.S.C. §1983.

In response, Plaintiff argues that this situation is analogous to the example of deliberate indifference set forth in *City of Canton*: that is, it is a "moral certainty" that school resource officers will both arrest students and encounter school disciplinary matters, and the need for a policy and

28

to train officers on the constitutional limitations of the use of force on students is "so obvious" that the failure to have such a policy or adequate training is "deliberately indifferent" to those students' constitutional rights. *See* 489 U.S. at 390, n. 10. Further, according to Plaintiff, it is obvious that once handcuffed and pinned to the ground, a seven-year-old with disabilities may not fully understand the situation and act consistently with his disabilities. Indeed, other courts around the country have recognized that a city's failure to train police officers, including school resource officers, "on appropriately interacting with juveniles who . . . may have a disability . . . was deliberately indifferent to a highly predictable consequence regarding juveniles." *See, e.g., McCadden v. City of Flint*, 2019 U.S. Dist. LEXIS 63244, *14 (E.D. Mich. Apr. 12, 2019).

In *McCadden*, a seven-year-old with ADHD had a behavioral episode related to his disability, and the school resource officer who was requested to assist immediately handcuffed the student for "almost one hour" without inquiring as to the student's disability. *Id.* at *2-3. Even in the absence of a pattern of violations, the Court refused to dismiss a *Monell* claim for failure to train "police officers on appropriately interacting with juveniles" precisely because they statistically are likely to have a disability that would affect a school resource officer's interactions with them – in other words, that Constitutional violations were statistically a highly probable consequence of interactions between special needs children and officers. *Id.* at *14.

Also, with respect to evidence of a policy regarding use of force in the setting of a special needs school, Plaintiff points to conflicting evidence as to whether the City had a policy that would have prevented the incident but on which they failed to train Officer Fattaleh, or whether the City lacked a policy altogether despite the clear need for one. [6] Nevertheless, Plaintiff asserts that

---

[6] City Manager Ron Smith, designated by the City to discuss a Memorandum of Understanding ("MOU") subsequently entered into between the City, the Board, and other

under either scenario, the City's conduct evidenced its deliberate indifference to the rights and safety of special needs students like L.G.

Regarding training, Plaintiff points to testimony that whether a policy in fact existed, the Statesville Police Department did not inform its school resource officers of any policy or practice governing when, or even more importantly, how to intervene, nor did it train school resource officers on "when to intervene in the school setting, when to let school staff handle that." Doc. No. 81-10 (30(b)(6) Onley Tr.) at 25. Also, Officer Fattaleh testified that he doesn't recall receiving training on any policy concerning when to intervene, or even being made aware that such a policy existed. Doc. No. 81-4 at 71:9-71:13; 106:18-107:5, 129:23-130:4, 132:13-147:8. Officer Turner was similarly unaware of any Statesville Police Department policy on when a school resource officer could intervene. Doc. No. 81-6 at 42:3-43:13, 46:24-48:9.

Therefore, Plaintiff claims that the need for a policy on the use of force is obvious in light of the particular circumstances of a police officer working at a special needs school and the likelihood that absent training officers would fail to protect the constitutional rights of the

law enforcement agencies, testified that the MOU "was basically spelling out the practices that were already in place and making clear delineations between law enforcement, the school system, and how to deal with situations that go on in these – you know, with the SROs and kind of just putting into a codification the practices that they're already using and making sure that everybody's on the same page on how to move forward." Doc. No. 87-1 at 8:17-8:22, 26:4-26:14, 36:10-36:20. Mr. Smith specifically confirmed that even if the City had not yet had a "written policy" prior to the MOU, "it was certainly a practice" that school resource officers were not supposed to intervene unless requested to or if there was an actual or eminent threat to health or safety. Id. at Tr. 36:21-37:8. On the other hand, when asked in discovery to identify "all policies, practices, procedures, and guidelines applicable to school resource officers with the Statesville Police Department in 2018," or to interactions between law enforcement and minors, the City identified only the Operating Procedures of the Statesville Police Department. Also, Interim Chief Onley, testifying on behalf of the City, stated that as of September 11, 2018, the City of Statesville did not have a policy on when school resource offices should intervene in a crisis situation in schools. Doc. No. 81-10 (30(b)(6) Onley Tr.) at 27:21-28:9, 34:12-34:25.

disabled students. According to Plaintiff, had the City trained Officer Fattaleh on a policy that school resource officers at Pressly were not to forcibly detain a young child unless requested by staff or there was an imminent risk of bodily harm, Officer Fattaleh would not have intervened on September 11, 2018. *See* Doc. No. 81-4 at 263 ("I don't remember anybody asking me to intervene."); Doc. No. 81-3 (Guerin Tr.) at 128:10-128:19, 134:2-134:12; Doc. No. 81-5 (Manners Tr.) at 144:13-144:22, 145:11-146:23; Doc. No. 81-9 (Samuels Tr.) at 79:17-80:10 (no staff requested Officer Fattaleh's assistance or feared for anyone's safety). In sum, Plaintiff argues that the City's failures establish a callous, deliberate indifference to the Constitutional rights, and the safety, of special needs students like L.G., in violation of § 1983.

As noted above, the Court finds this to be a close case. On the one hand, the City has proffered evidence of 1) a lack of similar prior incidents that suggest the City's approach was working to protect the students' rights, 2) specific additional training was therefore unnecessary (or at least not constitutionally required), and 3) the incident was from the City's standpoint simply an instance of aberrant behavior by one of its police officers. On the other hand, Plaintiff's evidence of 1) the substantial risk of harm to disabled students in the absence of proper use of force training for SROs, 2) Officer Fattaleh and others' belief that forcibly arresting seven year old autistic students was open to their unfettered "discretion" and 3) the possible evidence of a policy to defer to school teachers and administrators (absent risk of immediate, substantial physical harm not present here) on which Officer Fattaleh was not trained could – based on the Court's view of the current record – sway a reasonable jury to find that the City acted with "deliberate indifference" to the constitutional rights of L.G. and other disabled students. Therefore, the Court will deny the City's motion for summary judgment on Plaintiff's Section 1983 claims.

B. Plaintiff's State Law Claims

Plaintiff asserts claims under North Carolina law against the City for negligence and gross negligence (Second Claim); negligent hiring, supervision and retention and gross negligence (Third Claim); intentional infliction of emotional distress ("IIED") (Fifth Claim); negligent infliction of emotional distress (Sixth Claim); assault and battery (Seventh Claim); punitive damages (Eighth Claim); and false imprisonment (Ninth Claim). In some of these claims, Plaintiff alleges that the City is only vicariously liable (Fifth, Seventh, Eighth and Ninth claims); in others that it is both vicariously and directly liable (Second and Sixth claims) and in one claim only directly liable (Third claim). Each claim is discussed below.

### 1. Claims Asserting Vicarious Liability

#### a. Intentional Torts

With respect to the claims for IIED, assault & battery, false imprisonment and punitive damages, Plaintiff does not allege that the City has directly committed any wrongful act but rather only seeks to hold the City vicariously liable for Officer Fattaleh's conduct. Generally, "a principal will be liable for its agent's wrongful acts under the doctrine of *respondeat superior* when the agent's act (2) is committed within the scope of the agent's employment and in furtherance of the principal's business . . .." *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 296 (N.C. Ct. App. 2004). The City argues that because these torts reflect intentional wrongful conduct they are as a matter of law outside the course and scope of Officer Fattaleh's employment, and the City cannot be held vicariously liable for his actions. Heeding the clear guidance of the Fourth Circuit and courts in North Carolina, the Court disagrees.

The Court is bound to follow *Borneman v. United States*, 213 F.3d 819, 828–29 (4th Cir. 2000), [7] in which the Court of Appeals described the relevant North Carolina law as follows:

---

[7] The City did not challenge or seek to distinguish this authority in its reply brief.

While it is true, as the district court recognized, that under the North Carolina law of *respondeat superior,* an intentional tort is "rarely considered to be within the scope of an employee's employment," *Medlin v. Bass,* 327 N.C. 587, 398 S.E.2d 460, 464 (1990) (quotation marks and citation omitted), "rarely" does not mean "never." And in North Carolina, the scope-of-employment question is ordinarily one for the jury. *See id.* at 463; *see also Robinson v. McAlhaney,* 214 N.C. 180, 198 S.E. 647, 650 (1938); *Stanley v. Brooks,* 112 N.C.App. 609, 436 S.E.2d 272, 274 (1993); *Edwards v. Akion,* 52 N.C.App. 688, 279 S.E.2d 894, 900 (1981); *Evington v. Forbes,* 742 F.2d 834, 836–37 (4th Cir.1984) (recognizing North Carolina rule that close or doubtful scope-of-employment cases are submitted to the jury).

North Carolina case law discloses numerous instances in which the issue of whether an intentional assault by an employee was within the scope of employment so as to impose vicarious liability on the employer was determined to be a jury question. *See, e.g., Clemmons v. Life Ins. Co. of Ga.,* 274 N.C. 416, 163 S.E.2d 761, 766 (1968) (collection agent for insurance company threatened plaintiff with pistol when she was unable to pay premium); *Munick v. Durham,* 181 N.C. 188, 106 S.E. 665, 667 (1921) (city employee assaulted plaintiff when he paid portion of his water bill in pennies); *Caravan v. Tate,* 53 N.C.App. 161, 280 S.E.2d 528, 531 (1981), *modified,* 304 N.C. 696, 286 S.E.2d 99 (1982) (parking lot attendant drew gun on plaintiff after plaintiff refused to pay parking fee); *Edwards,* 279 S.E.2d at 900 (sanitation worker grabbed and hit plaintiff after dispute about the manner in which the worker collected plaintiff's refuse).

The principle that should govern this factual inquiry has been formulated in various ways by the North Carolina courts: whether the employee was "about his master's business or whether he stepped aside from his employment to commit a wrong prompted by a spirit of vindictiveness or to gratify his personal animosity or to carry out an independent purpose of his own," *see Medlin,* 398 S.E.2d at 463 (quotation marks and citation omitted); whether the employee acted "as a means or for the purpose of performing the work he was employed to do" or whether he "was advancing a completely personal objective," *id.* at 464; or whether an employee's act "was a means or method of doing that which he was employed to do" or whether he "departed, however briefly, from his duties in order to accomplish a purpose of his own, which purpose was not incidental to the work he was employed to do," *Wegner v. Delly–Land Delicatessen, Inc.,* 270 N.C. 62, 153 S.E.2d 804, 808 (1967).

*See also Wilkerson v. Duke Univ*., 229 N.C. App. 670, 676 (N.C. Ct. App. 2013) (holding that a law enforcement officer's employer may be vicariously liable for that officer's false imprisonment, assault, and battery). Therefore, the Court finds that it is for the jury to determine – based on whether the challenged conduct was "a means or for the purpose of performing the work he was

33

employed to do" or whether he "was advancing a completely personal objective" – if Officer Fattaleh was acting within the scope of his employment, thereby making the City vicariously liable for any of the claims that the Court permits to go to trial and are proven against Officer Fattaleh.[8,9]

### b. Negligence Based Torts

In addition to claims asserting that the City is vicariously liable for intentional torts, Plaintiff alleges that the City is also vicariously liable for claims "sounding in negligence" (negligence and negligent infliction of emotional distress). As to these claims, the City does not challenge the merits of the underlying claim against Officer Fattaleh but contends that it cannot be held vicariously liable because Officer Fattaleh is entitled to public official immunity and qualified immunity. However, as discussed above, the Court finds that Officer Fattaleh is not entitled to either public official immunity or qualified immunity for this alleged wrongful conduct. Therefore, because Plaintiff is entitled to proceed to trial on the claims sounding in negligence against Officer Fattaleh (Plaintiff's Second and Sixth claims) Plaintiff is entitled to proceed to trial on its vicarious claims against the City for the same conduct.[10]

### 2. Governmental Immunity

More broadly with respect to a portion of Plaintiff's state law claims, the City argues that it has governmental immunity against Plaintiff's claims. Under North Carolina law, a municipality

---

[8] Applying this test, a reasonable jury could find, as argued by Plaintiff, that Officer Fattaleh was acting within the course and scope of his employment because his unlawful conduct occurred while he was on duty and performing what he believed to be an arrest within the authority and discretion given to him by the City (through the Statesville police department) rather than engaged in pursuing a personal objective.

[9] As noted above, summary judgment is being granted as to the false imprisonment claim against Fattaleh and thus the City is entitled to summary judgment as well. Also, Plaintiff cannot recover punitive damages for the reasons discussed below.

[10] The City's motion for summary judgment as to Plaintiff's direct claims of negligence against the City in the Second and Sixth claims is discussed below.

and its officers or employees sued in their official capacity for torts committed while performing a governmental function are entitled to governmental immunity. *Taylor v. Ashburn*, 112 N.C. App. 604, 607 (1993). However, "[a] governmental entity may waive immunity by the purchase of liability insurance, thereby subjecting itself to liability for the tortious acts of its officers and employees." *Sellers v. Rodriguez*, 149 N.C. App. 619, 623, 561 S.E.2d 336, 339 (2002) (citations omitted); N.C. Gen. Stat. § 160A-485(a) (2003). Here, the City has purchased liability insurance that provides coverage for "law enforcement liability." Thus, the extent of the City's governmental immunity with respect to Plaintiff's claims must be determined by the scope of its insurance policy. *Id*. The City acknowledges that its liability insurance policy coverage for "law enforcement liability" encompasses Plaintiff's negligence claims but contends that it is entitled to governmental immunity for all of Plaintiff's claims arising from willful, wanton, and/or intentional conduct, including Plaintiffs' Second, Fifth, Seventh, and Ninth claims.

The City purchased a policy of insurance issued by Lloyd's London that provides coverage for "Law Enforcement Liability" with an underlying self-insured retention of $50,000, and excess limits of coverage up to $1,950,000. *See* Doc. No. 73-6. However, the following policy exclusion limits the scope of that insurance coverage:

> B. Any CLAIM or SUIT for BODILY INJURY, PROPERTY DAMAGE, or PERSONAL INJURY, including any award of attorney's fees and costs, resulting from:
> (b) Any knowing and intention deprivation of any rights protected under the United States Constitution or the Constitution of any State, Territory, or Protectorate of the United States; or,
> (c) Any act which is not reasonably related to the execution and/or enforcement of the law; or,
> (d) Any act committed with the knowledge and intent to cause bodily injury, property damage, or personal injury, or which could reasonably be expected to cause bodily injury, property damage, or personal injury unless the act of the assured was reasonably necessary to lawfully prevent injury to persons or damage to property."

*See* Doc. No. 73-6 at 20. Therefore, according to the City, to the extent Plaintiffs' claims arise from the intentional conduct of Officer Fattaleh or conduct which could reasonably be expected to cause bodily injury, the policy exclusions apply, and the City retains its governmental immunity for those claims.

But the policy also contains an "exclusion to the exclusion" which states:

However, Exclusion B. shall not apply to:

i.   Any liability on the part of the **NAMED ASSURED,** including liabilities from negligent hiring, training or supervision, arising out of an act by any other **ASSURED** resulting from **LAW ENFORCEMENT ACTIVITIES** and excluded herein, but this provision applies only to the liability of the **NAMED ASSURED** to pay any settlement, verdict or judgment; providing that the sole liability imposed on the **NAMED ASSURED** does not arise from any contractual duty to indemnify an **ASSURED**.

*Id.* Plaintiff relies on this policy language to argue that the City indeed has insurance coverage for the City's liability for Officer Fattaleh's wrongful conduct, whether negligent or intentional.

Recently, in *Summit Mgmt. Servs., Inc. v. Falls Lake Fire & Cas. Co.*, No. 521CV00110KDBDSC, 2022 WL 738666, at *3–4 (W.D.N.C. Mar. 11, 2022), this Court explained the principles of contract interpretation that guide its review of insurance policies under North Carolina law:

"An insurance policy is a contract and its provisions govern the rights and duties of the parties thereto." *C. D. Spangler Constr. Co. v. Indus. Crankshaft & Eng'g Co.*, 326 N.C. 133, 142, 388 S.E.2d 557 (1990). Where the relevant facts are not disputed, construing the policy is an issue of law. *See Parker v. State Cap. Life Ins. Co.*, 259 N.C. 115, 117, 130 S.E.2d 36, 38 (1963); *Trophy Tracks, Inc. v. Mass. Bay Ins. Co.*, 195 N.C. App. 734, 739, 673 S.E.2d 787, 790 (2009). Courts apply general contract interpretation rules when interpreting an insurance policy. *Accardi v. Hartford Underwriters Ins. Co.*, 373 N.C. 292, 295, 838 S.E.2d 454 (2020). For example, as in other contracts, the objective of construction of terms in an insurance policy is to arrive at the insurance coverage intended by the parties when the policy was issued. *Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co.*, 276 N.C. 348, 354, 172 S.E.2d 518 (1970). Also, the various terms of the policy "are to be harmoniously construed, and if possible, every word and every provision is to be given effect." *Woods v. Nationwide Mut. Ins. Co.*, 295 N.C. 500, 506, 246 S.E.2d

773 (1978); *see also Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C.*, 364 N.C. 1, 9, 692 S.E.2d 605 (2010) ("We construe all clauses of an insurance policy together, if possible, so as to bring them into harmony." (citation and internal quotation marks omitted)). If the policy contains a defined term, "the court applies that meaning unless the context requires otherwise." *Wachovia Bank*, 276 N.C. at 354, 172 S.E.2d 518.

However, there are also specific rules of interpretation for insurance policies under North Carolina law. Significantly, "wherever possible, the policy will be interpreted in a manner which gives, but never takes away coverage." *Wash. Hous. Auth. v. N.C. Hous. Auths. Risk Retention Pool*, 130 N.C. App. 279, 281, 502 S.E.2d 626 (1998) (citation and internal quotation marks omitted). In construing the coverage afforded by the applicable policy, "provisions of insurance policies and compulsory insurance statutes which extend coverage must be construed liberally so as to provide coverage, whenever possible by reasonable construction." *State Capital Ins. Co. v. Nationwide Mut. Ins. Co.*, 318 N.C. 534, 538, 350 S.E.2d 66 (1986), (citing *Moore v. Hartford Fire Ins. Co.*, 270 N.C. 532, 155 S.E.2d 128 (1967)).

To give effect to these principles, "any ambiguity or uncertainty as to the words used in the policy should be construed against the insurance company and in favor of the policyholder or beneficiary. *Id.* … However, if a court finds that no ambiguity exists, the court must construe the document according to its terms, giving undefined "nontechnical words ... their meaning in ordinary speech, unless the context clearly indicates another meaning was intended." *Woods*, 295 N.C. at 506, 246 S.E.2d 773.
…

Moreover, exclusions are not favored, and courts strictly construe exclusions against the insurer within the reasonable interpretation of the policy language. *See Eatman Leasing, Inc. v. Empire Fire & Marine Ins. Co.*, 145 N.C. App. 278, 281, 550 S.E.2d 271 (2001). "When construing the exclusion provision of a [an insurance] policy [the court is] guided by the rule that provisions which exclude liability of insurance companies are not favored and therefore all ambiguous provisions will be construed against the insurer and in favor of the insured." *State Capital Ins. Co. v. Nationwide Mut. Ins. Co.*, 318 N.C. 534, 538, 350 S.E.2d 66 (1986) (citing *Wachovia Bank*, 276 N.C. at 354, 172 S.E.2d 518); *see Owners Ins.*, 2022 WL 668382, at *4.

Plaintiff does not dispute that Exclusion B. to the LAW ENFORCEMENT liability coverage would exclude coverage for the City's liability for Officer Fattaleh's alleged intentional conduct absent the further "exclusion to the exclusion." Therefore, the answer to the question of the scope of the City's governmental immunity lies in the interpretation of that provision.

37

The City does not discuss the "exclusion to the exclusion" in either its moving brief or its reply. Plaintiff argues that the provision should be interpreted to exclude from coverage only intentional conduct by the City itself but continue to grant coverage for the City's vicarious liability where its officers, as other assureds, commit intentional torts resulting from law enforcement activities which would otherwise be excluded from coverage. Applying the legal rules discussed above to the "exclusion to the exclusion," the Court finds that, on the current state of the record, the policy does not clearly exclude coverage for Plaintiff's claims arising from Officer Fattaleh's intentional conduct or conduct likely to result in "bodily injury" so the City has insurance coverage and is not entitled to governmental immunity for those claims.

The NAMED ASSURED in the policy is the City of Statesville; however, the portion of the policy in the record does not contain any definition of ASSURED (even though as a capitalized and bolded word it is presumably a defined term under the policy). Nevertheless, reading the plain language of the policy, it appears clear that the NAMED ASSURED and ASSURED are intended to be different entities or individuals because the policy refers to "any *other* ASSURED," meaning that there is more than one ASSURED. Also, the context of the provision strongly suggests that police officers would be an ASSURED because they would be the ones out of whose acts and LAW ENFORCEMENT ACTIVITES the NAMED ASSURED (here the City) might be liable for negligent hiring, training or supervision. Therefore, for the purposes of summary judgment the Court – broadly interpreting the policy to provide rather than deny coverage as it is required to do – interprets the "exclusion to the exclusion" for Law Enforcement Liability to provide insurance coverage to the City for any settlement, verdict or judgment on account of its vicarious liability for the actions of Officer Fattaleh, whether arising out of negligence, intentional conduct or acts

38

likely to cause "bodily harm." Accordingly, the City has waived governmental immunity with respect to its alleged vicarious liability.

### 3. Punitive Damages Claim

In North Carolina, punitive damages are not allowed against a governmental body unless specifically authorized by statute. *Jackson v. Housing Authority of City of High Point*, 316 N.C. 259, 341 S.E.2d 523 (1986); *see also Long v. City of Charlotte*, 306 N.C. 187, 293 S.E.2d 101 (1982). "In the absence of statutory provisions to the contrary, municipal corporations are immune from punitive damages regardless of whether the function of the municipality is governmental or proprietary." *Jackson*, 316 N.C. at 263, 341 S.E.2d at 525.

Plaintiff does not allege in her Complaint, and has not cited to, any statutory provision that would permit recovery of punitive damages from the City. As such, the City is entitled to dismissal of the punitive damages count. *See e.g., Scott v. City of Durham*, No. 1:20-CV-558, 2021 U.S. Dist. LEXIS 162431, at *7 (M.D.N.C. Aug. 27, 2021).

### 4. Direct State Law Claims

#### a. Negligence and Gross Negligence

As noted above, to prove negligence a plaintiff must show: (1) legal duty; (2) breach of that duty; (3) actual and proximate causation; and (4) injury. *Estate of Long v. Fowler*, 270 N.C. App. 241, 251, 841 S.E.2d 290, 299 (2020). Gross negligence requires a plaintiff to prove each element of negligence and show "wanton conduct done with conscious or reckless disregard for the rights and safety of others." *Id*. at 253. An act is wanton when "it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." *Foster v. Hyman*, 197 N.C. 189, 191, 148 S.E. 36, 37–38 (1929), *quoted in Parish v. Hill*, 350 N.C. 231, 239, 513 S.E.2d 547, 551 (1999).

Plaintiff alleges that the City was negligent/grossly negligent because: (1) it failed to implement policies, procedures, and practices for when school resource officers should respond to a situation involving students in a school setting, (2) it failed to implement policies, procedures, and practices for how officers should respond to children with autism, and (3) it failed to properly supervise, train, and monitor Officer Fattaleh. (Doc. No. 24, ¶ 97).

The City argues that Plaintiff has failed to establish a standard of care as to what policies, procedures, and practices the City failed to implement; or, shown how the City failed to properly supervise, train, and monitor Officer Fattaleh. The City again argues that the record evidence shows that it had policies and procedures in effect, and provided supervision, training, and monitoring to Officer Fattaleh. Specifically, the City argues that the Statesville Police Department had Standard Operating Procedures in place that governed the conduct of officers, including SRO responding in a school situation. Additionally, Officer Fattaleh received other law enforcement training prior to the incident, including SRO specific training. Finally, he shadowed another SRO at Pressly for approximately 25 days as a form of in-field training.

Plaintiff responds that the City, like all entities and individuals, owes a duty of reasonable care to those with whom its police officers interact. Moreover, Plaintiff argues that the City was negligent in failing to implement policies and training to prevent school resource officers from intervening in situations like this because it is entirely foreseeable that such an incident could occur. Plaintiff notes that due to this foreseeability other law enforcement agencies and schools do have policies in place governing the interaction between school resource officers and students. In *McCadden*, 2019 U.S. Dist. LEXIS 63244, at *2-3, for example, the City Police Department that employed the school resource officer in question had a policy governing "police interactions with

40

children," which read, in part: "Juveniles . . . may be handcuffed or otherwise restrained at any time if, in the judgment of the officer, the juvenile poses a physical risk to the officer or others."

In sum, as discussed in depth above, Plaintiff's evidence of the substantial risk of harm to disabled students in the absence of proper use of force training for SROs, Officer Fattaleh and others' belief that forcibly arresting seven year old autistic students was open to their unfettered "discretion" and the possible evidence of a policy to defer to school teachers and administrators (absent risk of immediate, substantial physical harm not present here) on which Officer Fattaleh was not trained could convince a reasonable jury to find that the City was negligent or grossly negligent. Therefore, the City is not entitled to summary judgment on this claim.

  b. <u>Negligent hiring, supervision, and retention</u>

Under North Carolina law to support a claim of negligent retention and supervision against an employer, a plaintiff must prove: "(1) the specific negligent act on which the action is founded . . . (2) incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred; and (3) either actual notice to the master of such unfitness or bad habits, or  constructive notice, by showing that the master could have known the facts had he used ordinary care in oversight and supervision, . . .; and (4) that the injury complained of resulted from the incompetency proved." *Moricle v. Pilkington*, 120 N.C. App. 383, 386, 462 S.E.2d 531, 533 (1995)

While the City denies that Officer Fattaleh was incompetent to serve in his role, it argues that even if he was incompetent the claim would still fail for lack of any evidence that the City knew or had reason to know of any alleged incompetency. Prior to his hiring by the Statesville Police Department, Fattaleh completed Basic Law Enforcement Training at Davidson County Community College and served with multiple law enforcement agencies within North Carolina.

*See* Doc. No. 73-2, "City 000133-134." Moreover, Fattaleh served as a patrol officer with the Statesville Police Department, completed SRO specific training, and shadowed an existing SRO at Pressly. There is no evidence of any formal complaints, reprimands, or disciplinary action necessitated by Fattaleh's conduct prior to this incident.

Plaintiff responds that, given Fattaleh's previous incidents with students at Pressly, whether the City had reason to know he was incompetent to serve in his position must be decided by the jury. In *Wilkerson*, the North Carolina Court of Appeals denied summary judgment where a genuine issue of fact remained as to whether the police officer was incompetent and supervisors knew or should have known, based on issues noted in performance evaluations. *Wilkerson v. Duke Univ.*, 229 N.C. App. 670, 677, 748 S.E.2d 154, 160 (N.C. Ct. App. 2013). Plaintiff argues this case is analogous. However, Plaintiff extricates all context to fit these round facts in the square hole of *Wilkerson*.

In *Wilkerson* the employee was known to exhibit "uncontrolled" rage and received negative assessments in his performance evaluations. Here, Sgt. Rambo does not remember ever receiving a complaint about Fattaleh. (Doc. No. 82-8 Sgt. Rambo SBI Interview, p. 2). Moreover, both incidents, which Plaintiff argues should have put the City on notice, appear to have been minor and were not noted in Fattaleh's permanent file. The first incident involved Fattaleh receiving verbal counseling for "using a couple curse words and an inappropriate tone while talking to a student" in November of 2017. *Id.* Fattaleh also received written counseling in March of 2018 for allowing a student to "get under his skin" and "rais[ing] his voice at the student while close to the student" at Pressly. *Id.*; Doc. No. 82-9, Employee Performance Appraisal, p. 2. During that incident, Officer Fattaleh again used an inappropriate tone with a student as he told her: "'This is my school.' Like, 'You're not in charge here . . ..'" Doc. No. 81-4, Fattaleh Tr. 222:18-222:22.

However, neither incident seemed to raise any concern about Fattaleh's ability to serve as an SRO. In fact, when Sgt. Rambo followed up with the principal regarding the March 2018 incident, he "had nothing but good things to say about Fattaleh." *Id*. Similarly, the employee performance appraisal stated Fattaleh was meeting expectations and multiple times commented on how Fattaleh has grown in his position as an SRO and developed experience and understanding. (*See* Doc. No. 82-9). The March 2018 incident was purged from Fattaleh's personal file because it was during the probationary period. (Doc. No. 82-8 Sgt. Rambo SBI Interview, p. 2-3).

Additionally, in what is difficult to describe as anything other than an effort to mislead the Court or reckless inattention to the record, Plaintiff argued that Sgt. Rambo considered moving Fattaleh from Pressly because of his conduct as an SRO. However, what actually happened is far different. Sgt. Rambo requested to have a physical office at Pressly, but was told he was needed at the high school. Sgt. Rambo explained that if he did receive an office at Pressly, he would move Fattaleh. The proposed move was "not because Fattaleh had done anything wrong…" (Doc. No. 82-8 Sgt. Rambo SBI Interview, p. 3).

In sum, two minor incidents, when considered with the positive performance evaluations from Fattaleh's superior and Pressly's principle, are insufficient for a reasonable jury to find the City should have known Fattaleh was incompetent to serve. Therefore, the City is entitled to dismissal of the negligent hiring, supervision, and retention count.

c.   Negligent Infliction of Emotional Distress (NIED)

To state a claim for negligent infliction of emotional distress a plaintiff must demonstrate that (1) the defendant negligently engaged in conduct; (2) it was reasonably foreseeable that such conduct would cause the plaintiff to suffer severe emotional distress; and (3) the conduct did, in

fact, cause the plaintiff to suffer severe emotional distress. *Johnson v. Ruark Obstetrics &*
*Gynecology Assoc.*, P.A., 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990).

Plaintiff asserts that the City was negligent in failing to implement policies and training to prevent school resource officers from intervening in situations like this. Again, whether the negligence standard is met will be decided by a jury. Further, given the vulnerable student population at Pressly, a jury could find that it was reasonably foreseeable that being subject to excessive force by an untrained school resource officer would cause a young, special needs student severe emotional distress. And, as noted above, L.G. is alleged to have suffered severe emotional distress. Therefore, the City's motion summary judgment on the NIED claim will be denied.

C.  Americans with Disabilities Act and Rehabilitation Act Claims

Finally, the City seeks summary judgment on Plaintiff's claims under the Americans with Disabilities Act, 42 U.S.C. § 12132 ("ADA") and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. For the reasons discussed below, the Court finds that a reasonable jury could (or could not) find that the City violated those statutes so the City's motion will be denied.

Title II of the ADA prohibits discrimination against individuals on the basis of disability by public entities, including when an individual is "excluded from the participation in or . . . denied the benefits of the services, programs, or activities of the public entity . . .." 42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act prohibits programs or activities which receive federal funding from discriminating against an individual on the basis of a disability. 29 U.S.C. § 794. To state a claim under either statute, a plaintiff must allege that: "(1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability." *Nat'l Fed'n of the Blind v. Lamone*, 813

F.3d 494, 502 n.4, 503 (4th Cir. 2016) (combining analysis of ADA and Rehabilitation Act claims "and principally analyz[ing] the ADA claim").[11] The Fourth Circuit further construes "Title II of the ADA to allow a plaintiff to pursue three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." *A Helping Hand, LLC v. Balt. County*, 515 F.3d 356, 362 (4th Cir. 2008).

In its moving brief, the City's sole argument against Plaintiff's ADA and Rehabilitation Act claims is that L.G. does not fall within the class of individuals protected under the statutes with respect to the challenged conduct because "the statute's concept of 'program or activity' does not readily encompass police department's function of arresting lawbreakers, even if they are disabled." Doc. No. 73-1 at 24. More specifically, the City claims that the terms "eligible" and "participate" imply voluntariness on the part of the applicant and thus do not apply to criminal suspects held against their will. The Court disagrees.

In *Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 211 (1998), the Supreme Court – in the context of deciding if prisoners are eligible participants under the ADA because they are held against their will – directly rejected the City's "voluntariness" argument: "Petitioners argue that the words 'eligibility' and 'participation' imply voluntariness on the part of an applicant who seeks a benefit from the State. . .. This is wrong . . . because the words do not connote voluntariness . . .." Accordingly, courts around the country have confirmed that arrests by local police departments are governed by the ADA. *See, e.g., Waller v. City of Danville*, 556 F.3d 171, 174 (4th Cir. 2009)

---

[11] The only difference in the analysis under Section 504 of the Rehabilitation Act is that a plaintiff must also allege that the public entity is federally funded and that the denial of benefits was "'solely by reason of disability.'" *McCadden*, 2019 U.S. Dist. LEXIS 63244 at *21 (internal citations omitted).

("In the context of arrests, courts have recognized two types of Title II claims: . . . (2) reasonable accommodation, where police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees");[12] *S.R. v. Kenton County Sheriff's Office*, 2015 U.S. Dist. LEXIS 172043, *19-20 (E.D. Ky. Dec. 28, 2015) (ADA applies to sheriff's deputies' handcuffing of disabled students).

As decided above, whether the City was deliberately indifferent to and had a disparate impact on disabled students by failing to enact or train its SROs on a policy for lawfully handling their arrests cannot properly be decided on summary judgment. Plaintiff argues that the City's alleged practice of leaving intervention and the decision to handcuff entirely to officer discretion,[13] (while neutral on its face), is deliberately indifferent to the risk that students with disabilities will be victims of improper force by school resource officers or has a disparate impact on disabled students like L.G., who need different behavioral interventions. Where a plaintiff alleges that a public entity "knew or should have know[n] about the elevated likelihood that any . . . juveniles would suffer from a disability and should have taken action to address how officers interact with [those] juveniles," they have set forth a claim for violation of Title II of the ADA. *McCadden*,

___

[12] The City argues that the application of the ADA to police department arrests may include an "exigency" exception that bars Plaintiff's claims in this case. *See Waller v. City of Danville*, 556 F.3d at 174-75. However, whether or not any "exigent" circumstances existed in the context of Officer Fattaleh's vigorous arrest of a seven year old autistic student for "spitting" on a teacher who did not request the officer's assistance appears, at the very least, to be a question for the jury that puts the issue outside of the City's motion for summary judgment.

[13] *See* Doc. No. 81-4 (Fattaleh Tr.) 159:1-159:10; 201:12-201:16 ("the discretion is up to me whether or not to interject as a law enforcement officer"); 264:22-264: 24, 329:2-329:4 ("officer discretion basically is the guiding light"), 348:2-348:5; Doc. No. 81-10 (30(b)(6) Onley Tr.) at 29:25-30:25 (City policy gave officers discretion about when to effectuate an arrest), 55:2-55:15 (officers have "discretion to decide how they think it needs to be handled" even if the person has a handicap), 72:19-73:13 (It was up to Officer Fattaleh's discretion to go straight to handcuffs on September 11, 2018).

2019 U.S. Dist. LEXIS 63244 at *20-21 (denying motion to dismiss ADA claim); *see also*, *A Helping Hand*, 515 F.3d at 362 (Title II of the ADA permits a private right of action for disparate impact discrimination, regardless of whether the public entity intentionally discriminated against a particular child.).

Further, and perhaps most significantly, Title II of the ADA requires the City "make reasonable modifications in policies, practices, or procedures . . . to avoid discrimination on the basis of disability . . .." 28 C.F.R. § 35.130(b)(7). Accordingly, school resource officers are required to provide reasonable modifications when interacting with individuals with disabilities. *S.R. v. Kenton Cty*., 2015 U.S. Dist. LEXIS 172043, at *8, *21-22 (a Title II claim is stated where the "Sheriff's practice of handcuffing disabled students is impermissible because it bypasses less severe measures such as crisis intervention, de-escalation, etc. to address their behavioral problems."). Thus, a school resource officer may fail to provide reasonable modifications where they demand "unnecessary compliance without allowing for the nature of the children's disabilities which make such compliance difficult or impossible." *Id*. at *22.

Here, as described above, Plaintiff contends that the City had no policies specific to students with disabilities and provided no modifications to disabled students. Doc. No. 81-4 (Fattaleh Tr.) at 146:3-146:7 ("I don't recall there being any specific policy or specific training regarding interactions with children with autism or disabilities in a school specifically for treating and educating those students."). Plaintiff thus argues Officer Fattaleh did not, in fact, provide any accommodations for or treat students with disabilities any differently and instead used even more force in order to gain compliance from L.G. when he failed to comprehend the situation, consistent with his disabilities. Accordingly, the Court finds that a reasonable jury could determine that the City failed in its obligation to reasonably accommodate L.G.'s disabilities.

Therefore, in summary, Plaintiff has, for purposes of this motion for summary judgment, established an opportunity to present a claim for violation of both Title II of the ADA and Section 504 of the Rehabilitation Act at trial.

## IV.    ORDER

**NOW THEREFORE IT IS ORDERED THAT**:

1. Colleen Guerin and William Manner's Motion for Summary Judgment (Doc. No. 66) is Denied;

2. Michael Fattaleh's Motion for Summary Judgment (Doc. No. 67) is Denied, except as to Plaintiff's claim for false imprisonment; and

3. The City of Statesville's Motion for Summary Judgment (Doc. No. 73) is Denied, except as to Plaintiff's claims for false imprisonment, punitive damages, and negligent hiring, supervision, and retention.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: July 14, 2022

Kenneth D. Bell
United States District Judge